SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

AQUA–SONIC PRODUCTS CORP., Ultra-
sonic Dental Products, Inc., Leon Schek-
ter, M. Joshua Aber, Martin Hecht, Den-
tasonic, N.V., Inventel Corporation and
Melvin Hersch, Defendants.

No. 80 Civ. 5513(RWS).

United States District Court,
S. D. New York.

Aug. 7, 1981.

Donald N. Malawsky, Regional Administrator, New York City, for plaintiff; Margaret M. McQueeney, Ralph A. Siciliano, Elizabeth A. Barnes, New York City, La Brenna Jones, Mark D. Powers, of counsel.

Litman, Friedman, Kaufman & Asche, New York City, for defendants Inventel Corp. and Martin E. Hecht; Richard M. Asche, Jack T. Litman, Lewis R. Friedman, Russell M. Gioiella, New York City, of counsel.

## OPINION

SWEET, District Judge.

The Securities and Exchange Commission ("SEC") seeks a declaration that defendants Martin Hecht ("Hecht") and Inventel Corporation ("Inventel") have violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. §§ 77e(a) and 77e(c) ("the registration provisions"), and Sections 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder ("the antifraud provisions"). The SEC also seeks a permanent injunction barring the offering and sale of securities in the form of investment contracts. The declaration will be entered in the form of a judgment and the injunction will be granted as set forth below.

## PRELIMINARY PROCEEDINGS

This action was commenced on September 30, 1980 by the filing of a complaint, and a motion for preliminary injunction was filed on December 19, 1980. The SEC sought to restrain the defendants, Aqua-Sonic Products Corp. ("Aqua-Sonic"), Ultrasonic Dental Products, Inc. ("Ultrasonic"), Leon Schekter ("Schekter"), M. Joshua Aber ("Aber"), Dentasonic, N.V. ("Dentasonic"), Melvin Hersch ("Hersch"), Hecht and Inventel from certain conduct about to be described. Discovery was expedited, the preliminary injunction motion was adjourned, and the defendants' motion for summary judgment seeking dismissal of the complaint for lack of jurisdiction was denied on June 3, 1981. Thereafter, all defendants except Hecht and Inventel entered into consent decrees and the SEC discontinued its action against them.[1] From June 10 to June 17, 1981 the SEC motion for preliminary injunction against Hecht and Inventel, the remaining defendants, was tried to the court and consolidated with the trial on the merits pursuant to F.R.Civ.P. 65(a). What follows are the court's findings of fact and conclusions of law.

1. Final Judgments of Permanent Injunction by Consent were entered against defendants Aqua-Sonic, Dentasonic, Schekter and Aber on June 15, 1981, enjoining them from further violations of the registration and anti-fraud provisions in connection with any securities. Final Orders Pursuant to Stipulations and Undertakings ("Orders") were entered as to defendants Hersch and Ultrasonic, also on June 15, 1981, in which said defendants, under penalty of contempt, agreed not to violate the registration and anti-fraud provisions as to any securities in the future. Pursuant to said Orders, the action was dismissed as to defendants Hersch and Ultrasonic with the exception that the court retained jurisdiction over them to enforce the provisions of the Orders.

FINDINGS OF FACT

*The Enterprise*

Arthur Kuris ("Kuris") and Aber were neighbors and friends, the former being an inventor and patent holder and the latter an attorney. Kuris had obtained patents applying the principles of ultrasonic wave propagation to various fields, one of which was dentistry. A device under the trade name of Cavitron was developed and marketed. The Cavitron gained wide acceptability among dentists and employed ultrasonic waves to dislodge plaque in the course of dental prophylaxis. The operation of the Cavitron required a coolant which was provided by a spray of water originating from the customary sources.[2] Kuris conceived of an improvement of the Cavitron which would employ sterile water as the coolant for the ultrasonic process and would thereby reduce the risk of any contamination resulting from micro-organisms which might be found in tap water.

These new products for which Kuris held patent rights were termed Steri Products. One of the products, known as the Steri Prophy Unit, was designed as a complete, self-contained ultrasonic prophylaxis unit utilizing pre-packaged sterile water. The other Steri Product, called the Steri Satellite Unit, was designed to be affixed to existing dental equipment to supply pre-packaged sterile water.

After discussions with Aber, in early 1978 Kuris met with Aber's partners Hecht and Schekter to develop a plan to market and distribute these Steri Products. The lawyers had formed a professional corporation then called Schekter, Aber and Hecht, P.C. ("SAH"). As a consequence of these discussions, four corporations were established by Schekter, Aber and Hecht: Aqua-Sonic and Ultrasonic, New York corporations; Dentasonic, a Netherlands Antilles corporation; and Inventel, a Delaware corporation. Schekter, Aber and Hecht were the original shareholders of Dentasonic until November, 1978 when Kuris acquired a 19% interest.

The shares in both Aqua-Sonic and Ultrasonic were held by sole shareholders, their respective principal officers. The original shareholders of Inventel were Schekter, Aber and Hecht until February of 1979, at which time the corporation redeemed the shares of Schekter and Aber, leaving Hecht the sole shareholder.

Immediately after incorporation, Dentasonic purchased from Kuris the patent and other related rights to the Steri Products for the United States and Canada for $406,-500 payable in installments. Kuris retained a security interest in the patent and other rights conveyed to Dentasonic. Dentasonic sold only the United States marketing and manufacturing rights to the Steri Products to Aqua-Sonic, which had been incorporated in April 1978, for $26 million pursuant to an agreement dated June 1, 1978, this sum to be paid not only from a percentage of the proceeds from the sale by Aqua-Sonic of licenses to sell the Steri Products, but also from a percentage of the profits received by Aqua-Sonic from actual product sales. Until payment of the $26 million Dentasonic retained a security interest in the rights conveyed to Aqua-Sonic, held certain voting rights to all of Aqua-Sonic's stock and was given a security interest in certain accounts receivable and contract rights, certain inventory and inventory records, equipment, inventions, patent rights and trademarks in all products and proceeds of Aqua-Sonic.

SAH developed certain materials for Aqua-Sonic describing its proposed method of doing business ("the promotional materials") to be set forth more fully below. In short, Aqua-Sonic proposed to sell to licensees the right to sell Steri Products in certain specified geographical areas. Ultrasonic was described as an optional sales agent for the licensees. Inventel, which was not described, entered into a letter agreement with Aqua-Sonic by which Aqua-Sonic agreed to pay Inventel $2.2 million, ostensibly as a finder's fee for bringing about the sale of the rights in the Steri Products from Dentasonic to Aqua-Sonic

---

**2.** Indeed, as a discomfort and coincidence the court received an extra-judicial demonstration of the effective operation of a Cavitron during the course of this proceeding.

and for past and future consulting services. Under the letter agreement, Aqua-Sonic agreed to pay Inventel a portion of the proceeds from the sale of licenses and the sale of the Steri Products and related patents or trademarks.

*The Promotional Materials*

After the corporations were organized, in the course of the preparation of the promotional materials, SAH sought an opinion of another law firm, Messrs. Baer, Marks & Upham, with respect to the applicability of the securities law to the proposed enterprise. SAH received a memorandum in or about May, 1978 from an associate of that firm, Barry Mandel, a prescient lawyer as things have turned out, to the effect that the license arrangement might be considered an investment contract. The partners at SAH directed one of their associates to research the issue in the summer of 1978, and after considerable discussion concluded otherwise. The promotional materials were modified as set forth below and the enterprise proceeded.

A market consultant was retained and for $500 provided an analysis of the available market based primarily on the use of Cavitron, and the marketing practices in the industry which included the use of so-called dental depots, in effect, wholesale houses offering dental supplies to all kinds of dentists, a focal element in the licensing plan. Also, Kuris obtained and passed on to Hecht a letter from a Dr. Henry Goldman, an apparently well-regarded dental authority, which could be construed as an endorsement of the Steri Products. The letter was described succinctly by Hecht in his investigative testimony, who realized the need to overcome the resistance of dentists who were going to be told that their present machines were unhygenic. Hecht likened their attitudes to those of the 19th century surgeons who would say to Pasteur "Get out of here Louis." In addition, an article in the Journal of Periodontology entitled "Microbial Contamination of Dental Units and Ultrasonic Scalers" was obtained.

Prototype models had been developed, and Logical Technical Services ("LTS"), an engineering firm specializing in electronic applications, was retained in late 1978 to convert them into finished marketable products.

With these preparations in hand or in contemplation, certain documents were prepared to be used in the enterprise. During the period from on or about May 1, 1978 through August 31, 1978, these promotional materials were developed and used in discussions with potential licensees or their representatives. These included:

(a) an Information Memorandum describing the Steri Products and the nature of the offering, with exhibits attached thereto including a tax opinion letter prepared by SAH and financial illustrations projecting sales of the products and revenues.

(b) the Aqua-Sonic license and security agreement and notes payable to Aqua-Sonic (prior to inclusion of the so-called Advertising Fund to be discussed below), and related instructions.

(c) a document entitled "An Offer to Act as Sales Agent."

(d) the Ultrasonic sales agency agreement, security agreements, and notes payable to Ultrasonic (prior to inclusion of the Advertising Fund), and related instructions.

(e) a reprint of the aforementioned article by Arthur Gross (and others) from the Journal of Periodontology.

(f) a four-page document entitled "Confidential for Professional Use Only."

During the period from on or about September 1, 1978 through October 31, 1978, the following documents were used in a two-pocketed packet, the second version of the offering package.

(a) a new Information Memorandum Relating to Exclusive Rights revised to reflect, among other things, certain management changes at Aqua-Sonic, the tax opinion letter and financial illustrations.

(b) the Aqua-Sonic license and security agreement and notes payable to Aqua-Sonic and related instructions.

(c) a document entitled "An Offer to Act as Sales Agent."

(d) the Ultrasonic sales agency agreement, security agreements, and notes payable to Ultrasonic and related instructions.

(e) two large professional photographs of what appeared to be a completed Steri Prophy Unit and Steri Satellite Unit such as would be sold.

(f) The Journal of Periodontology article.

(g) a copy of a letter dated September 12, 1978, to Aqua-Sonic from E. A. Greenlee, President of LTS, concerning the commercial production of the Steri Products.

(h) a copy of the letter dated August 22, 1978, to Kuris from Dr. Henry Goldman.

A third and final version of the materials in use after November 1, 1978, consisted of the documents contained in the second version plus the following documents:

(a) a letter dated November 1, 1978 signed by defendant Hersch with attachments relating to the creation of the Steri Products, Advertising Fund and supplemental tax opinion by SAH.

(b) a package of revised closing documents relating to the license, sales agency and Advertising Fund, and

(c) a revised summary of the offering entitled "Confidential for Professional Use Only—Summary of · Revised License for Steri Products."

Licensees who had entered into the notes and agreements contained in the first two versions of the offering materials were asked to sign revised agreements and notes which conformed to the third offering package.

The Information Memorandum summarized the obligations of the licensees in the licensing agreement as follows:

> The License Agreement delineates the relationship between the parties and imposes specific duties and obligations on the Licensee. These duties include, but are not limited to: (a) vigorous promotion of the distribution and sale of the Products Parts and Supplies; (b) maintenance and employment of sufficient working capital and net worth to enable Licensee to fulfill all of his duties, obligations and responsibilities under the License Agreement; (c) employment of such agents, representatives and employees as Licensee in his sole discretion, may deem to be necessary to assist him in the performance of some or all of his duties and obligations as Licensee; (d) use and maintenance of an accounting and reporting system as may be required by Licensor; and (e) use of order forms designed by Licensor and (f) adherence to certain standards for advertising materials used in connection with the business.

. . . . .

> Licensee will be an independent contractor and be solely responsible for all expenses and costs incurred by him in the conduct and promotion of his business. In addition, Licensee will be required to and be responsible for the vigorous and satisfactory promotion, distribution and sale of the Products, Parts and Supplies for use in his Territory so as to obtain a reasonable share of the market ... In the event that a Licensee does not satisfactorily fulfill his duties and responsibilities as set forth in the License Agreement, Licensor may elect to terminate his License.

Although the Information Memorandum did not mention an offer by anyone to act as a sales agent, it did state that a licensee may retain "agents, representatives or employees" to assist in marketing the Steri Products, and added:

> The choice as to whether to deal with Dental Depots and/or to retain agents, representatives, employees or others is solely that of the Licensees. The Licensor takes no position on this matter, for the most effective means of achieving satisfactory market penetration will vary according to the prior experience of the Licensee, the amount of time and effort the Licensee is willing to expend to exploit the License, and the nature of Licensee's Territory.

Annexed to the Information Memorandum as Exhibit H is a set of financial illustrations designed to demonstrate the potential profitability of the licenses. These illustrations assume that a potential licensee does not retain the sales agent. (A similar set of illustrations annexed to the offer by Ultrasonic to act as sales agent makes the opposite assumption.)

The Information Memorandum stated further:

> In the event that a Licensee, in his sole discretion, elects to retain and/or employ anyone to assist him in the performance of some or all of his duties, obligations and responsibilities under the License, Licensee must undertake to actively supervise their activities on his behalf to ensure that they perform their activities in a manner which will be consistent with Licensee's activities and responsibilities to Licensor.

> .    .    .    .    .

> In the event that a Licensee does not satisfactorily fulfill his duties and responsibilities as set forth in the License Agreement, Licensor may elect to terminate his License.

The Information Memorandum and the license application indicate that the license is available to a limited class of persons who are capable of performing all their obligations and exercising their rights under the license agreement, and if they so chose, the sales agency agreement. Under the heading "Who Should Apply for a License," the Memorandum stated:

> A License will be granted only to a person who has considerable knowledge and experience in financial and business matters, appreciates and understands the merits and economic risks of this business. Experience has shown that this type of business is not suitable for and should not be pursued by persons who lack substantial assets. . . .

> A License will be granted only to an Applicant in reliance on his representations and warranties that he has himself, or together with any business and financial advisor with who he may consult,

knowledge and experience in financial and business matters, that he is capable of evaluating the merits and risks of this transaction, and that he is able to bear the economic risks of this transaction.

The license application provided:

> Applicant hereby represents and warrants as follows:

> .    .    .    .    .

> 4. Applicant and/or his designated representative has such knowledge and experience in financial and business matters, and investments in particular, that he is capable of evaluating the merits and risks of the Applicant's acquisition of a License and has obtained, in Applicant's judgment, sufficient information from Licensor relating to the License to evaluate the merits and risks of the contemplated transaction.

The "Offer to Act as Sales Agent," if accepted by the potential licensee, placed the responsibility for all sales of Steri Products for the benefit of a particular licensee in Ultrasonic. Certain rights, however, were retained by the licensee.

The Ultrasonic sales agency agreement provided that the licensee has the absolute "right to cancel this Agreement at any time upon ninety days' written notice" and that the agent:

> will uniformly maintain the prices established from time to time by Principal [licensee] for the Products, and conform to such terms of sale and other selling and ordering conditions as may be determined and required from time to time as herein provided.

It further provided that:

> All orders shall be subject to approval of items, price and credit by Principal and shall be confirmed by customers. All quotations for sales made by Agent to customers, or prospective customers, must be made expressly subject to the approval and confirmation of Principal and shall not be binding until such approval is given by Principal. All Products shall remain the property of Principal until sold.

and that:

> [B]ooks, records and copies of invoices shall be open at all times during business

hours to the inspection of any duly authorized representative of Principal.

The Aqua-Sonic documents described over 100 geographical territories in the United States, and each standard territory was designed to contain approximately the same number of dentists, although there were larger territories available. The fee for a typical license under the License Agreement was $159,500 payable as follows: $9,150 in cash upon the granting of the license; $9,150 in the form of a negotiable promissory note, bearing interest at 7% per annum and due January 15, 1979; and, $141,200 by a non-recourse promissory note, bearing interest at 6% per annum and due January 1, 1985, but requiring pre-payment based on a portion of the proceeds from the sale of the Steri Products. The initial term of the license expires on December 31, 1985; however, an option was included to extend the license for an additional five-year period. Under the license agreement Aqua-Sonic was solely responsible for the development and manufacture of the Steri Products.

The typical licensee under the sales agency agreement paid a $16,600 fee to defendant Ultrasonic, as follows: $500 in cash upon acceptance of the offer; $500 by recourse promissory note payable on January 15, 1979, and $15,600 by non-recourse promissory note due December 1, 1984, but requiring pre-payment based on a portion of the proceeds from sales of the Steri Products. In addition, defendant Ultrasonic was entitled to a commission of 20% of gross sales of Steri Products under the terms of the sales agency agreement.

During a later stage of the offering, SAH created the Advertising Fund to promote the Steri Products for investors and to increase the tax benefits available to them. The Fund was a joint venture to be administered by two clients of SAH, Hanson Fassler Associates, Inc. and Morris Baumstein Associates, Inc. Investors were required to make the following contribution to the Advertising Fund: $400 in cash upon obtaining the license; a $400 negotiable promissory note due on January 15, 1979; and a $13,200 non-recourse promissory note due December 1, 1984, but requiring pre-payment based on a portion of the proceeds from sales of Steri Products. The addition of this mandatory contribution did not increase the overall price of a typical investment because the amount payable to defendant Ultrasonic under the sales agency agreement was correspondingly reduced by the amount payable to the Fund. Moreover, monies paid by investors prior to the creation of the Advertising Fund were reallocated from Ultrasonic to the Fund apparently at the direction of SAH through Aqua-Sonic.

After November 1, 1978 the Aqua-Sonic, Ultrasonic and Advertising Fund Agreements, and the notes relating thereto, were physically bound together and offered to licensees in a single package. The entire cost of the Aqua-Sonic enterprise for the typical licensee, including the Aqua-Sonic license agreement, the Ultrasonic sales agency agreement and the Advertising Fund was: $10,050 in cash; $10,050 in recourse promissory notes due January 15, 1979; and $170,000 in non-recourse notes due December, 1984 and January, 1985.

The tax opinion letter and supplementary materials stated that licensees could include the non-recourse notes, the cash payments and the recourse notes in their basis for amortization and that the license fee could be amortized over eight years. Licensees were further advised that they could deduct the full contract price of the sales agency agreement and Advertising Fund contributions during 1978 and 1979. Thus, a typical investor who was personally liable for $20,100 on his investment was advised that, assuming no sales of the products, he could take tax deductions of $38,400 in 1978 and $20,000 in 1979. Investors were informed that they would receive additional tax benefits by retaining the sales agency. In addition to the described materials two letters were sent by Aqua-Sonic to all licensees instructing them how to treat their investment on their 1978 and 1979 federal income tax returns.

When an investor retained Ultrasonic, the sales agency agreements authorized Ultrasonic to perform all significant marketing functions, including finding customers, taking orders, collecting proceeds, and paying expenses and taxes. Additionally, the selling price of the products was to be agreed upon between Ultrasonic and the investor; however, Ultrasonic was authorized to reduce the sales price unilaterally so long as its commission on the sale was correspondingly reduced.

*The Selling*

The Aqua-Sonic licenses were offered and sold to investors throughout the United States. Hecht contacted financial planners, accountants, and attorneys throughout the country and recruited a number of individuals as commissioned salesmen, and with varying, not always successful, results. These individuals, some of whom were financial consultants for some of the licensees, received commissions for telling potential licensees about Aqua-Sonic, signing up licensees and transmitting properly executed agreements to Aqua-Sonic.

Many offering packages were distributed to salesmen and purchasers of the Aqua-Sonic offering from the Southern District of New York by making use of the means, instruments and instrumentalities of interstate commerce and of the mails. Generally, interstate commerce, the mails and telephones were used in connection with the Aqua-Sonic offering.

Hecht arranged sales meetings in various cities including Phoenix, Portland, Los Angeles, Denver, New York and San Francisco to recruit salesmen and solicit licensees and to describe the license and sales agency agreements and the tax consequences of the Aqua-Sonic offering. Kuris demonstrated the prototypes of Steri Products. In total, between May 1 and December 31, 1978, Aqua-Sonic investments were purchased by 50 licensees for approximately $12,100,000 of which $11,200,000 was in the form of non-recourse promissory notes and $900,000 in cash and recourse notes.

The testimony of eleven Aqua-Sonic licensees was taken through depositions outside the jurisdiction, one of whom, Rex Zimmerman, was also a salesman of the offering. Two licensees testified at trial. These individuals were, for the most part, well established in full-time careers and business endeavors or were retired and, with two or three exceptions, all possessing some knowledge of finance and investment and sufficient funds to employ that knowledge. Pursuant to the promotional materials the licensees were required to represent that each possessed net assets in excess of $100,-000 and income in the 50% bracket.

The licensees included members of SAH, the wife of one of the principals of the firm handling the advertising and promotion for Steri Products, and a number of people who had engaged in over ten years of business transactions, a vice-president of a substantial public corporation with extensive business experience, the president of businesses related to the sale, production and use of asphalt products, a partner in the restaurant business, a shareholder of a small manufacturing corporation, the vice-president of a public service corporation, and a petroleum jobber, a dentist, a farmer, a computer analyst, a builder and seller of private homes, a corporate vice-president of employee relations, a retired schoolteacher, a school principal, a full-time physical therapist, the president of a data processing company, and retirees. None had any experience selling dental products and for the most part the territories of the licensees were not close to the residences of the licensees. Two or three of the licensees, Dorothy Baxa, Leonore Haas, and possibly Edward Abrahamson, did not read the described documents.

Most licensees testified they were primarily interested in an income-producing investment and a tax shelter and did not intend to become actively involved in the business. Moreover, some licensees were told or otherwise led to believe that, after making the initial payments in 1978 and 1979, they would have no further responsibilities and that no additional monies would be required. The availability of the sales agency to market the product was an im-

portant factor in certain of the licensees' decision to purchase the Aqua-Sonic license. Some investors did not distinguish between Aqua-Sonic and Ultrasonic and viewed the offering as a single package.

The promotional materials neither offered nor advised of the existence of any sales agent other than Ultrasonic and in fact, although acceptance of Ultrasonic's offer to act as sales agent was purportedly an optional feature of the Aqua-Sonic offering, all Aqua-Sonic licensees executed the sales agency agreement. A fair construction of the promotional materials and the depositions indicate that Aqua-Sonic was responsible for the development and production of the products and Aqua-Sonic, Ultrasonic and the Advertising Fund for the marketing and promotion of the products.

*The Operation of the Enterprise*

David Glasser ("Glasser") became Aqua-Sonic's first president and sole shareholder primarily at the suggestion of Kuris and his advisors. Glasser resigned in or about August 1978 because, among other reasons, he was advised in an opinion letter written by his attorney that the offering might be a security under the federal securities laws and might involve violations of other laws, including anti-trust and federal food and drug statutes. Glasser had also become concerned when he was asked to sign, on behalf of Aqua-Sonic a series of documents, including a note for over $25 million with Dentasonic. Following Glasser's resignation, Hecht in the summer of 1978 recruited a friend, defendant Melvin Hersch, to be president and sole shareholder of Aqua-Sonic.

Leonard Suroff ("Suroff") was recruited to be Ultrasonic's president and sole shareholder. Suroff was a practicing patent attorney who was recommended by Kuris and who had had some experience dealing with the dental supply depots. During the time Suroff was associated with Ultrasonic, all checks were signed by Hecht or one of his law partners as well as by Suroff. Suroff never executed any sales agency agreements. Following Suroff's resignation in December 1978, as a consequence of the

SEC investigation, Hecht recruited Melvin Ehrlich, a professor of physics, to be president of Ultrasonic. Ehrlich has been president and sole shareholder since that time.

At the time the Aqua-Sonic licenses were sold to investors, the Steri Products were in the prototype stage and required further development before they could be manufactured and sold. Aqua-Sonic had retained LTS to convert them into finished marketable products, and evidence was presented that in the summer of 1978 production early in 1979 did not seem unreasonable. However, the models given to LTS in late 1978 were incapable of delivering sterile fluid and required significant redesign.

LTS did developmental work on the early models which resulted in the creation of its first prototype model in late 1979 after the encountering of difficulties in obtaining certain of the ultrasonic components. However, the model was incapable of delivering sterile water. Various correspondence and reports from LTS advised Aqua-Sonic of the progress and problems in the development of the Steri Products. At about the time Hecht severed his relationship with Aqua-Sonic and became of counsel to SAH, in March 1979, Aqua-Sonic had a bank balance exceeding $250,000.

As of June, 1981 the units were still not ready for sale, since final production models had not been produced and for a period of one year until the spring of 1981 no work had been performed due to Aqua-Sonic's instruction that it would no longer pay LTS. Testimony at trial established that additional changes are required to produce the Steri Satellite at an estimated cost of $8,000 to $10,000 plus the $36,000 and $78,000 required for hard tooling. The design and tooling will take an estimated 24 to 32 weeks. Soft tooling would cost less than hard tooling but the end product would be of much lower quality and the life of the tool itself would be short. In order to make the Steri Prophy Units into commercially marketable products, additional design changes would take approximately three months to make at an estimated cost of $15,000 to $20,000, and $61,000 to $118,000

for hard tooling. No clinical testing has ever been performed on either unit. The tooling for production has not yet begun and approximately $1,200 remained in Aqua-Sonic's bank account as of June 16, 1981. Furthermore, Aqua-Sonic's two-year agreement with Kuris' Creative Ultrasonics Corp. has expired and Kuris is no longer obligated to perform any more consulting services in connection with his inventions.

### Misrepresentations and Omissions

Hecht and Inventel concede that if the licenses are held to be investment contracts, the securities laws were violated, initially, of course, by the failure to register the securities. It is also conceded that other information which would have been required was left out of the promotional materials, namely the interests of the named defendants, the role of SAH, and financial information relating to the corporations involved including the use of proceeds, commitment, working capital and the reduced price at which the licenses were offered to insiders. Of course, given the view of the license adopted by the defendants, no financial information was supplied, and thus the categories of information just described, required to be included in offering materials, were omitted.

The market report upon which the tax opinion was based was produced within 24 hours on unverified information and was sufficiently superficial with respect to market factors, prices and amortization to make the tax opinion on which it was based misleading. The financial projections were similarly empty of objective support, and the product was not ready for market as represented. The absence of any clinical testing of the Steri Products was not set forth, nor was the research adequate to permit reference to the underlying "definite causal relationship" claimed between the use of unsterile water and various infections. The photographs of the Steri Products carried the implication that they were the finished product when in fact they were prototypes incapable of performing their professed prophylactic function. All these matters constituted misrepresenta-

tions or omissions of material facts required if the licenses are considered to be securities.

### The Role of Hecht and Inventel

Hecht participated in the discussions which led to the formation and structure of the enterprise and the preparation of the described materials by the law firm of which he was a member. He attended meetings at which the enterprise was discussed in order to explain the transactions, both to those who would seek to interest licensees and licensees themselves. He assisted in the recruiting of officers of Aqua-Sonic and Ultrasonic. For services in organizing the selling effort, Inventel, of which Hecht had been the sole shareholder since February, 1979, received $200 and has rights to substantial additional funds to be divided among Hecht, Schekter and Aber, if the enterprise goes forward based upon Hecht's efforts.

In Hecht's own words, "I was trying to sell the sellers." He did so in significant ways, including the dissemination of the SAH opinion letter concerning the application of the securities laws to the enterprise. He also participated not only in the selling and the structuring of the transaction but SAH, during the time he was a member, initially served virtually all administrative functions for Ultrasonic and Aqua-Sonic, kept the books, bank accounts and prepared correspondence. Although Hecht was not an officer, director or employee of those corporate defendants, as a partner of SAH he participated in the administrative activities just described in addition to his selling and personnel activities.

### The Role of the SEC

In 1978 the SEC initiated inquiries concerning the enterprise, requested information and received by September, 1978 certain of the requested documents. In 1979 investigative examinations were conducted. Hecht's for example, took place on August 29, 1979. This action was commenced in August, 1980 and the motion for preliminary injunction was made in December, 1980.

## THE ISSUES

From the outset of this proceeding, Hecht's skilled counsel has urged that but two issues have been presented: (1) whether the court has jurisdiction, and if so, (2) what relief is appropriate. Both parties have concentrated primarily on the first issue, whether or not the Aqua-Sonic offering of a license, coupled with an offer by Ultrasonic to act as a sales agent, constituted the offering and sale of an "investment contract" under the rules laid down in *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). According to Hecht and Inventel, this is a case of first impression. At the least, it is one more of a long line of cases presenting the difficulties of determining the essential elements of an "investment contract."

Since the described materials were drafted to avoid the very issue now raised by the SEC, an additional threshold issue is presented by the claim of the SEC that the evidence relevant to the jurisdiction issue includes not only the knowledge and intent of the defendants but also the state of mind and capacity of the licensees beyond that which is proclaimed in the described materials and reflected in the licensees' answers to the Aqua-Sonic questionaires. There lies in this issue the troublesome taint of an ex post facto determination, a revisionist view of the transaction, resulting from attitudes contrary to those expressed on paper at the time the transactions at issue took place.

## CONCLUSIONS OF LAW

### The Relevant Evidence

It is already the law of this case by virtue of the denial of defendant's motion for summary judgment that the economic realities of the transaction are controlling, not simply the documents which constitute the formalities of the transaction involved. The authorities for that proposition were cited in the court's opinion of June 5 and need not be reiterated.

The enterprise and the described materials, by the very nature of the operation of the securities laws, must be examined as of the time that the transaction took place, together with the knowledge and the objective intentions and expectations of the parties at that time. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852–53, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975); *Piambino v. Bailey*, 610 F.2d 1306, 1320 (5th Cir. 1980), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980); *SEC v. Int'l Scanning Devices*, [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,147 at 92,171–175 (W.D.N.Y. 1977). The subjective intentions or motivations of the investors are irrelevant. *Piambino v. Bailey, supra.* To the extent that subsequent events give rise to inferences that are relevant to the economic reality of the transactions at the time they occurred, they were considered, but only to that extent. The LTS discussions, correspondence and projections in 1980 and 1981 do not give rise to such inferences though they may be relevant to the question of relief.[3] Similarly, the SEC's proposed findings relative to the operation of the dental supply depots is disregarded beyond that which was contained in the described materials. No probative evidence was offered in this connection, nor could any findings be made concerning the ability of the licensees to conduct their proposed business in the absence of actual experience which was precluded by the march of events.

In fact, no sales of the products occurred and no opinion evidence was offered that such sales could or could not have occurred in the contemplated manner even if the products had been available. Although Mr. Abrahamson might have intended to retire to Maine where his franchise is located, and although Mrs. Baxa and others had purchased franchises across the country from their home, there was insufficient evidence upon which it could be found, as opposed to surmised, that the licensees were not capable of vigorously promoting the sale of Steri Products as they had warranted to do. It is

---

**3.** Even for that purpose, the testimony is of doubtful use, given the extent of the consent decrees already entered into which appear to preclude Aqua-Sonic's resumption of business.

significant, however, both in terms of relief and in terms of contemporaneous construction, to note that after the defendants received the Mandel memo, indicating the possible applicability of the securities laws, the language casting responsibility on the licensee was further strengthened and reinforced while none of the operative features of the enterprise was altered.

Finally, perhaps the most significant determination in terms of evidence of economic reality is the definition of the enterprise. Hecht and Inventel seek to limit the evidence—and consequently the court's consideration—to the promotional materials, the license to sell the patented products and the offer of Ultrasonic to perform that task, subject to the licensees' control, right to know, and capacity to cancel the services of Ultrasonic on stated terms and conditions. In the felicitous example of counsel for the defendants, the license is likened to the independent dealership for the sale of automobiles which has yet to be termed by the SEC, or anyone else, an investment contract. Were the inquiry and the evidence so limited, perhaps the defense would prevail, but if all the facts relevant to the enterprise as it operated in 1978 and early 1979 are considered, including the capitalization, stage of development of the Steri Products, tax consequence, and method of operation, the economic reality differs materially from the exemplary automobile dealership. It is those facts, pressed forward by the SEC under the criteria set forth in the authorities that compel the declaration that the license agreement and sales agency executed by the licensees constituted an investment contract.

*The Relevant Criteria*

■ *Howey* is the obvious starting place, and its three criteria for determining an investment contract are easily stated: (1) an investment of money, (2) in a common enterprise, (3) on an expectation of profit to be derived solely from the efforts of the promoter or third parties. Here the input of money and the common enterprise are conceded and the profit element is only slightly in conflict. The principal field of

battle between the parties has been in their contentions concerning the efforts of others. The defendants place their chief reliance on the promotional materials, which clearly state that the licensee has the right to sell the Steri Products without using Ultrasonic as a sales agent, without reliance upon sole efforts of the promoter or third parties. They urge further that, even having contracted for the services of Ultrasonic, the Aqua-Sonic licensees retained substantial rights, powers and duties. The SEC contends to the contrary, claiming that the economic reality dictated sole or very substantial reliance on others.

■ Early on in the development of this line of cases, the requirement that the profits be the result of the sole effort of the promoter or a third party was modified to "undeniably significant" efforts of others. *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). The Court of Appeals for our circuit has cited *Turner* with approval in *Glen-Arden Commodities, Inc. v. Costanino*, 493 F.2d 1027, 1035 (2d Cir. 1974) and affirmed Judge Neaher when he employed the *Turner* modification in *SEC v. Galaxy Foods, Inc.*, 417 F.Supp. 1225, 1239 (E.D.N.Y.1976), *aff'd mem.* 556 F.2d 559 (2d Cir.), *cert. denied*, 434 U.S. 895, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977). *See also Williamson v. Tucker*, 645 F.2d 404, 418–19 (5th Cir. 1981). I conclude therefore that Hecht and Inventel do not escape the "efforts of others" criterion by reliance on the word "solely." It is the significance of the efforts of others to produce the profits that must be established.

Even under the narrow interpretation of the enterprise urged by defendants, namely, the conduct of the business of the licenses to sell Steri Products, viewed realistically, any profits would have resulted from the efforts of others. All licensees signed the Ultrasonic sales agency agreement and all thus retained Ultrasonic to sell the Steri Products. Whether or not certain licensees might also have exerted efforts to sell will never be known, given the terms of the

consent decrees. The sales agency agreement itself, and the showing as to its actual centrality to the entire scheme, constitutes significant evidence, in the absence of contrary testimony, that the efforts of others would be "undeniably significant." However, the enterprise in its totality consisted of far more than the sales agency. No sales could be achieved absent the product to be sold, and for that—the development of the Steri Products from the rough prototype stage—the licensees were entirely dependent on Aqua-Sonic, a dependence which could not be relieved from any other source. *See Galaxy Foods, supra,* 417 F.Supp. at 1241–42.

There is a series of cases cited by the SEC where the sale of a franchise or a commodity with the offer of services have been held to be investment contracts. *Glen-Arden Commodities v. Costantino, supra; Continental Marketing Corp. v. SEC,* 387 F.2d 466 (10th Cir. 1967), *cert. denied,* 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968); *SEC v. Brigadoon Scotch Distributors, Inc.,* 388 F.Supp. 1288 (S.D.N.Y.1975); *SEC v. Galaxy Foods, supra; see also SEC v. W. J. Howey Co., supra.* Hecht and Inventel cite cases where a sale of a franchise or land together with the offer of services has been held not to constitute an investment contract where purchasers have retained non-illusory rights or powers. *Schultz v. Dain Corp.,* 568 F.2d 612 (8th Cir. 1978); *Fargo Partners v. Dain Corp.,* 540 F.2d 912 (8th Cir. 1976); *Mr. Steak, Inc. v. River City Steak, Inc.,* 460 F.2d 666 (10th Cir. 1972), *affirming* 324 F.Supp. 640 (D.Colo.1970); *Chapman v. Rudd Paint & Varnish Co.,* 409 F.2d 635, 641 (9th Cir. 1969); *Wieboldt v. Metz,* 355 F.Supp. 255 (S.D.N.Y.1973); *see generally Williamson v. Tucker, supra,* 419–21, 424–25.

The criterion by which these two lines of cases can be reconciled has been stated to be passivity, *Galaxy Foods, supra,* 417 F.Supp. at 1241, dependence, or latent investor control, *Williamson, supra* at 421. Because of the nature of the products being offered, the character of the sales agency and the nature of the industry to be served, the Aqua-Sonic licensees were dependent,

passive and incapable of latent investor control, or, in other words, unable to exercise whatever powers over the enterprise they formally retained.

Another criterion has been advanced by the SEC, then tentatively withdrawn, the so-called "risk capital" basis which has evolved under the California and Hawaii Securities laws, *see Stanley v. Commercial Courier Service, Inc.,* 411 F.Supp. 818, 821–22 (D.Ore.1975); *Wiebolt v. Metz, supra,* at 259–61; *Mr. Steak, supra,* 324 F.Supp. at 646, and has been the subject of considerable commentary, *see Forman, supra,* 421 U.S. at 857 n.24, 95 S.Ct. at 2063. While this approach has not been accepted in the federal courts as a substitute for the classic *Howey* test, nor is it so embraced here, in my view such a theory can be subsumed under the "efforts of others" test of *Howey,* or as an extension or further definition of passivity or dependence. *See Stanley, supra,* at 823; *Wiebolt v. Metz, supra,* at 260–61. What is really at issue in this formulation is whether the enterprise more closely resembles a traditional offer to invest, to put money at risk dependent on the efforts of others, or the purchase of a right to conduct a business whose resources are or practically can be controlled by the purchaser, not by the seller. Here, the cash used to purchase the license, some $900,000, was, on the basis of this record, the only cash in the enterprise. True, Aqua-Sonic possessed some know-how and patent rights, but the only operating capital, as the term is commonly understood, came from the payments of licensees. There were no bank loans, stock issues, notes or any other financing made available to Aqua-Sonic. On this record I am not reluctant to conclude that a risk capital approach is helpful, and that under such a criterion, the described materials constituted an investment contract. However, such a conclusion merely buttresses the conclusions already set forth; perhaps consideration of the risk capital concept merely casts the criteria of passivity and dependence in somewhat more traditional terms, traditional at least in the commercial, if not the legal, world.

The economic reality here is that the fuel which drove this enterprise as far as it went was the concept characterized by Hecht as a TABA:

> I don't like to use the term "investment": This year [1979] I call what I do a TABA which is a tax advantage business acquisition, because, literally, the individual is still acquiring a business and · it is only through the method of his acquisition that he obtains tax benefits. In this particular case [Pool Patrol] the structure of the acquisition of the license gives tax benefits (Hecht Investigative Transcript at 102).

The defendants offered a tax shelter and sought to make it possible for the licensees to take advantage of the tax provisions described in the tax opinion contained in the described material. This tax treatment was the emphasis of the selling effort and the questionnaire, and apparently the underlying motivation of the licensees. The year-end discussions between Mr. Abrahamson, on the way to the opera, and his accountant, placed in clear outline the principal feature of the enterprise—its tax effect. The defendants sought by the form of the transaction to make the enterprise a business and not an investment contract, a TABA and not a security. The economic reality was otherwise.

The defendants, perhaps perceiving the drift of the authorities, urged this case be treated as one of first impression with unique facts. When pressed for the authorities closest on the facts defendants cited *Williamson* and *Mr. Steak.* To the same inquiry, the SEC responded *Galaxy Foods.* The difference in the factual setting of each of the cases cited seems to this court to reinforce the conclusions reached above. A restaurant franchise or an undivided interest in realty could be managed as an independent business and possessed features other than those identified with a traditional investment. The franchised sale of groceries depended much more heavily on the ability of others to obtain and deliver the goods. Here, as it in fact turned out, the licensees were totally dependent on defendants not only for the merchandising of Steri Products, in which arguably the licensees could have been involved, either practically or as a matter of right, but also upon Aqua-Sonic for the products to be sold. Finally, the only source for funds for such production was the payment by the licensees. Although structured as a TABA, it turned out to be an investment in which the licensees were at risk and where in reality there was no latent investor control of the enterprise nor any evidence of the existence or exercise of such control other than the nominal right to sell the products without Ultrasonic, a right which I conclude failed to constitute control.

*The Relief*

Defendants have urged that the relief to be granted, if any, for the violations—conceded and found—must meet the strictures of *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90 (2d Cir. 1978), *affirming* 410 F.Supp. 1002 (S.D.N.Y.1977), a proposition not seriously challenged by the SEC. In determining whether or not to issue a permanent injunction the Honorable Lloyd F. MacMahon in *Commonwealth* listed the factors to be considered. 410 F.Supp. at 1020, a listing which was quoted with approval by the Court of Appeals, 594 F.2d at 100. These included a finding of liability for illegal conduct, the degree of scienter, whether the occurrence was an isolated one or not, contrition, and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

Obviously, the liability has been found although Hecht and Inventel are expected to continue their assertions that the licenses were not investment contracts.[4] At the same time, the defendants throughout have been straightforward and candid in their acknowledgment that no attempt was made to comply with the securities law and

---

4. The issue here is not that of a good faith defense, which was held wanting by the Honorable Edward R. Neaher in *Galaxy Foods*, but rather the closely related scienter and future intent.

have consistently conceded a violation of those laws by way of a failure to register, for example, if it is concluded, contrary to their contention, that the enterprise involved an investment contract. Of course, that concentrates the issue on the heart of Judge Friendly's opinion in *Commonwealth*, scienter and the likelihood of similar future conduct.

On three occasions Hecht was made aware that other members of the bar viewed the enterprise as one that might be required to comply with the securities laws. The memo of the associate of the Baer Marks firm was rendered to SAH specifically with respect to this issue. Glasser and Suroff, the first presidents of Aqua-Sonic and Ultrasonic, resigned, stating that their counsel had raised questions concerning the applicability of the securities laws and a letter was shown to Hecht to that effect. Finally, of course, the inquiries of the SEC itself constituted notice of the possibility of the impending litigation. However, the unfavorable memorandum by the Baer Marks associate was reviewed by a SAH associate, the authorities were apparently discussed and the SAH partners reached a different conclusion. Whatever their secret convictions may have been, there is no direct evidence of a knowing violation.

Nevertheless, in the context of this case, under the law of this circuit, recklessness would amount to scienter. *See Oleck v. Fischer*, 623 F.2d 791, 794 (2d Cir. 1980). Here two outside firms rendered opinions contrary to the final SAH conclusion. The SAH conclusion was bottomed on research and analysis by an associate who, it must be inferred, knew the details of the enterprise including the financial interests of his employer partners. Not to have obtained another outside opinion and to rely on the opinion of financially interested attorneys must be considered reckless under these circumstances, so reckless as to constitute scienter.

What then remains is the most significant of the factors, the likelihood of future violations by Hecht, who through his counsel, professes an abandonment of the prac-

tice of law. (As far as his relationship with SAH, this has been established.) Hecht seems equally adamant in his intent to continue the offering of TABA's, whether those known to the SEC as a consequence of this investigation—the sale of the pool alarm system or the ultrasonic toothbrush—or other similar enterprises. A reading of Hecht's investigative transcript reveals a man who has obtained new knowledge of an area of opportunity—The TABA—including an identification of others who participate in the merchandising of such acquisitions. The blurring of definitions of these acquisitions and investment contracts is amply demonstrated by this litigation. It can therefore be inferred that there is a likelihood that Hecht could again err, to view it charitably, in the same fashion as he has done here. Therefore the requirements of *Commonwealth* have been met and a permanent injunction will issue.

What really is at stake, one suspects, is not the opprobrium attached to District Court determination of a securities act violation in a difficult and evolving area of the law but rather the procedural consequences which would flow from a permanent injunction and a contempt citation which might flow from the injunction, were the SEC and Hecht to differ in the future on the essential character of a TABA which he might seek to sell. Obviously, every effort should be made to fit the terms of any injunctive relief to the violation found to have been committed, particularly here, where the argument has been advanced with some force that even the SEC took over a year, or almost two, depending on when one starts counting, to conclude that Hecht and the other defendants had acted in violation of the securities acts. It is to be hoped that the SEC will help the court to clarify, or at least characterize, the conduct to be enjoined, by a description of the prohibited conduct in specific rather than general terms.

A judgment will be submitted on notice within ten (10) days.

IT IS SO ORDERED.