## W. H. HORNADAY et al. v. STATE.

No. A-3941.   Opinion Filed June 30, 1922.
(208 Pac. 228.)

(Syllabus.)

1.   **Licenses—Purposes of Blue Sky Law.** The purposes of the Blue Sky Law (chapter 49, Session Laws 1919) are twofold:

> First. To prevent stockbrokers and promoters from perpetrating frauds and impositions on unsuspecting investors in hazardous undertakings.

> Second. To protect credulous and incompetent persons from their own inclinations to speculate in hazardous undertakings, entered into on their own account or on the advice of friends, though not brought about by interested promoters or stockbrokers.

2.   **Same—That Defendant's Counsel Had Matter Pending in Other Undeveloped Oil Lease Without Solicitation not Within Purview of Blue Sky Law.** Where an individual, without solicitation or influence of stock sales inducements, purchases an undivided interest in an undeveloped oil lease, with the expectation of becoming one of its promoters, the assignor of such interest under the circumstances shown here is not within the purview and intent of the regulations and penalties of the Blue Sky Law.

3.   **Constitutional Law—Reasonable Regulation Invading Individual's Rights of Contract by State Boards.** As to what constitutes reasonable regulations, invading the rights of individuals to make their own contracts, by or through boards or agents of the state under the federal Constitution, depends upon the facts and circumstances of each particular case—in this case not necessary to determine.

Appeal from District Court, Logan County; Edward D. Oldfield, Judge.

W. H. Hornaday and others were found guilty of violating the blue sky laws, and they appeal. Reversed.

C. G. Horner, for plaintiffs in error.

Geo. F. Short, Atty. Gen., R. E. Wood, Asst. Atty. Gen., and A. V. Dinwiddie, Co. Atty., for the State.

BESSEY, J. Plaintiffs in error were jointly informed against and found guilty of violating the blue sky laws, as alleged in the information, and their punishment was assessed by the jury at a fine of $200 each. The charging part of the information is as follows:

"On and prior to the 6th day of April, A. D. 1920, the said W. H. Hornaday, John D. Richards, L. L. Billings, C. E. Wright, J. L. Patterson, and Chas. Kinkade, then and there being, did then and there willfully, unlawfully, and feloniously offer for sale and sell certain speculative securities in said county and state to one Fred J. Armstrong, the same being the securities of a purported organization known as the Tri-State Oil, Gas, and Mineral Association, the said W. H. Hornaday, John D. Richards, L. L. Billings, C. E. Wright, J. L. Patterson, and Charles Kinkade then and there being the officers and directors of said purported organization, which said speculative securities so sold as aforesaid were in words, letters, and figures as follows, to wit:

" ' Assignment of Oil and Gas Lease.

" 'Whereas, on the——day of February and March, 1920, a certain oil and gas mining lease was made and entered into between C. F. Hornback and others, lessor, and C. E. Wright and associates, lessee, covering the following described land in the county of Crawford and state of Arkansas, to wit: One thousand acres, more or less, blocked by the Tri-State Oil, Gas, and Mineral Association—this assignment to be returned to the Tri-State Oil, Gas, and Mineral Association in exchange for $500.00 worth of stock in said association. when completed, and when called for by the board of trustees of said association; said lease being recorded in the office of the register of deeds in and for said county in Book—— at page ——; and

" 'Whereas, the said lease and all rights thereunder or incident thereto are now owned by C. E. Wright and associates:

" 'Now, therefore, for and in consideration of one dollar and other good and valuable considerations, the receipt of which is hereby acknowledged, the undersigned, the present

owners of the said lease and all rights thereunder or incident thereto, do hereby bargain, sell, transfer, assign, and convey unto Fred J. Armstrong an undivided interest in their right, title, and interest of the original lease and present owners in and to said lease and rights thereunder in so far as it covers the above-described lands, and to his heirs, successors, and assigns.

" 'And for the said consideration the undersigned, for themselves and for their heirs, successors, and representatives, do covenant with the said assignee, his heirs, successors, or assigns that they are the lawful owners of the said lease and rights and interests thereunder, and of the personal property thereon or used in connection therewith, that the undersigned have good right and authority to sell and convey the same, and that said rights, interest, and property are free and clear from all liens and incumbrances, and that all rentals and royalties due and payable thereunder have been duly paid.

" 'In witness whereof the undersigned owners and assignors have signed and sealed this instrument this 6th day of April, 1920.

" '[Signed] C. E. Wright.
" 'L. L. Billings.
" 'Chas. Kinkade.
" 'J. D. Richards.
" 'By C. E. Wright, Atty.'

" 'The said W. H. Hornaday, John D. Richards, L. L. Billings, C. E. Wright, J. L. Patterson, and Charles Kinkade, while acting together as officers and directors and trustees of said association, in the promotion and sale of said speculative security as aforesaid, did on said day and date sell said speculative security as aforesaid to the said Fred J. Armstrong for the sum of $100, the same being sold on the installment plan, of which said sum the sum of $50 was then and there on the 6th day of April, 1920, paid to said defendants by the said Fred J. Armstrong, and the second installment of $25 being paid to said defendants by the said Fred J. Armstrong on the 13th day of May, 1920; that on and prior to the said 6th day of April, the said W. H. Hornaday, John D. Richards, L. L. Billings, C. E. Wright, J. L. Patterson,

and the said Charles Kinkade sold said speculative securities to divers persons for divers sums of money, the names of said persons and amounts paid therefor being unknown to the county attorney, all of said sales as aforesaid being made by said defendants, W. H. Hornaday, John D. Richards, L. L. Billings, C. E. Wright, J. L. Patterson, and Charles Kinkade, without first having secured a permit from the state issues commission of the state of Oklahoma to offer for sale and sell in said county and state said speculative securities as aforesaid, as provided by chapter 49, Session Laws 1919 of the state of Oklahoma, all of which acts of said defendants being contrary to the form of the statute in such cases made and provided and against the peace and dignity of the state of Oklahoma.''

The statute upon which this prosecution is predicated is chapter 49, Session Laws 1919, entitled:

''An act to prevent unfairness, imposition of fraud in the sale or disposition of certain 'Securities' herein defined by requiring an inspection thereof, providing such inspection, supervision and regulation of the business of any person, association, partnership or corporation engaged or intending to engage, whether as principal, broker or agent, in the sale of any such securities in the state of Oklahoma, as may be necessary to prevent unfairness, imposition or fraud in the sale or disposition of said securities and prescribing penalties for violation thereof.''

The terms ''securities'' and ''speculative securities'' are defined as follows:

''The terms 'securities' as used in this act shall be taken to mean stock certificates, shares, bonds, debentures, certificates of participation, membership contracts, contracts or bonds for the sale and conveyance of land on deferred payments or installment plan, or other instrument in the nature thereof by whatsoever name known or called and including the capital stock of any and all corporations offering the same for sale.

"The term 'speculative securities' as used in this act shall be taken to mean and include:

"(1) All securities to promote or induce the sale of which, profit, gain or advantage unusual in the ordinary course of legitimate business is in any way advertised or promised;

"(2) All securities for promoting the sale of which a commission of more than ten per cent. is offered or paid;

"(3) All securities into the specified par value of which the element of chance or hazard of speculative profit or possible loss equal or predominate over the element of reasonable certainty, safety, and investment;

"(4) All securities the value of which materially depends on proposed or promised future promotion or development rather than on present tangible assets and conditions;

"(5) The securities of any enterprise, association, partnership or corporation which has included or proposes to include in its assets as a material part thereof, patents, formula, good will, promotion, or intangible assets.

"(6) Securities made or issued in furtherance or promotion of any enterprise or scheme for the sale of unimproved land or undeveloped land on any deferred payments or installment plan, when such lands are not situated in the state of Oklahoma and the value of such securities materially depends on the future performance of any stipulation by the promoters of such enterprise to furnish irrigation or transportation facilities, or other value-enhancing utility or improvement."

Section 2 of the act provides that it shall be unlawful for any person, copartnership, association, or corporation, either as principal or through brokers or agents, to sell or offer for sale by means of any advertisements, circulars, or prospectus, or by any other form of public or private offering or to attempt to promote the sale of any speculative securities in this state, including the capital stock of such promoter,

without the approval of the state issues commission, as further provided in the act.

The concluding paragraph of section 10, relating to securities not included within the meaning of this act, is as follows:

"The provisions of this bill shall not apply to the sale of stocks or bonds where the same are sold for cash and no commission or fee is paid, directly or indirectly, for the sale of the same and no expense for such sale is charged either to the company of issue of the purchaser of such securities."

Section 14 provides a penalty for the violation of the provisions of this law of a fine of not less than $100 nor more than $5,000, or by confinement in the state penitentiary for not less than one or more than seven years.

Separate demurrers to the information were interposed by each of the defendants on the grounds that the facts stated did not constitute a public offense, that the information shows on its face that the court had no jurisdiction to hear and try the cause, and that the information did not substantially conform to the requirements of the chapter on criminal procedure. Each of these demurrers was overruled.

For the purpose of throwing light on the motive and intent of plaintiffs in error and the motives and understanding of the several purchasers of interests in the mining lease set out in the information, we quote from the testimony as follows:

"Q. What is your name? A. Fred J. Armstrong.

"Q. How long have you lived in Guthrie? A. About 25 years.

"Q. How many of the defendants were you personally acquainted with? A. Judge Hornaday and Mr. Billings.

"Q. Did you have any transaction with either of these defendants in what is known as the Tri-State Oil, Gas, and Mineral Association, on or about the 6th day of April, 1920? A. Yes, sir.

"Q. What was it and with whom? A. Judge Hornaday sold me an assignment for $100.

"Q. Where and when? A. Here in Guthrie at the courthouse, in the basement in Judge Hornaday's office. At that time he was justice of the peace."

Cross-examination:

"Q. You yourself, isn't this correct, you desired to obtain an interest in these leases they had over there; that is correct, isn't it? A. No, sir, not the lease, the company. My intention was to join the organization.

"Q. You read the paper you got? A. Yes, sir.

"Q. That is what the paper said, wasn't it?

"Mr. Dinwiddie: Objected to as not the best evidence.

"The Court: Sustained. Exception allowed.

"Q. You read the paper? A. Yes, sir.

"Q. You had heard of this matter before you went to see Col. Hornaday? A. Yes, sir.

"Q. And you had heard different parties talking about it? A. Yes, sir.

"Q. And you concluded that you desired, yourself, to go into it? A. Yes, sir.

"Q. I mean you heard other parties than Col. Hornaday and these defendants? A. Yes, sir; and I heard Col. Hornaday talking, too.

"Q. Because of the talk you heard from different parties you went, yourself, to Judge Hornaday to see if you could acquire an interest in this proposition? A. Yes, sir.

"Q. And then you went to see Judge Hornaday to see if you could get an interest in it? A. Yes, sir.

"Q. You testified before in this case, did you not? A. Yes, sir.

"Q. You recall testifying, then, that you went to Judge Hornaday's office and asked him if you could acquire an interest? A. I did that; yes."

Albert Hirzel testified that in December, 1919, defendant Billings solicited him to buy an interest in this mining lease, and that he purchased an assignment similar to the one set out in the information. Another witness, H. A. McWright, testified that he purchased an assignment of an interest in this mining lease through Billings, but had no distinct recollection of the time nor of the inducements that caused him to make the purchase.

It was agreed and stipulated by the parties that neither the defendants nor the association had secured from the state issues commission a permit to sell stock or speculative securities, as defined in the hereinbefore quoted blue sky law.

The specific sale charged here was the sale made by Hornaday to Armstrong. The testimony of other witnesses concerning other sales was doubtless, and we think properly, admitted to show that the defendants may have been in the business of selling undivided interests or assignments in the oil and gas lease mentioned in the information.

At the threshold of this investigation the question arises whether an assignment of an undivided interest in an oil and gas mining lease, ipso facto and unexplained, constituted a security or speculative security within the meaning of the act.

The purpose of this statute, as gathered from the title considered together with the context of the act, appears to be twofold: First, to prevent stockbrokers and promoters from perpetrating frauds and impositions on unsuspecting invest-

ors in hazardous undertakings; second, to protect credulous and incompetent persons from their own inclinations to speculate in hazardous enterprises, entered into on their own account or on the advice of friends, though not brought about by interested promoters or stock brokers.

The objects, then, are to prevent fraud and unfair dealing in securities, as well as to prevent honest people, free from sinister influences, from investing in uncertain, ephemeral, "get-rich-quick" stocks and securities. In other words, it is a statute designed in part to protect credulous persons against their own inherent weakness—a weakness akin to the gambler's hope of winning a prize. We think it is now well settled that both of these objects, within constitutional bounds, properly come within regulations prescribed by the police power of the state. Clearly the state has the right to protect its citizens against impositions and frauds. Just how far the state may go in acting as a guardian for its incompetent and improvident citizens is not so definitely established. Hall v. Geiger-Jones Co., 242 U. S. 539, 37 Sup. Ct. 217, 61 L. Ed. 480, L. R. A. 1917F, 514, Ann. Cas. 1917C, 643; Caldwell v. Sioux Falls Stockyards Co., 242 U. S. 559, 37 Sup. Ct. 224, 61 L. Ed. 493; Ala. & N. O. Trans. Co. v. Doyle (D. C.) 210 Fed. 173; notes and annotations Blue Sky Laws, L. R. A. 1917F, 524 et seq.

Clearly, it would be impractical, as well as unconstitutional, for the state to attempt to scrutinize and regulate all the contractual relations of its citizens relating to mortgages, stocks, bonds, and securities. It is beyond the power of the state by unreasonable regulations to cast an unreasonable burden upon interstate commerce or upon the freedom of individuals to make their own contracts. Just what constitutes an unreasonable interference with the freedom of individual contracts is often hard to determine. Hall v. Geig-

er-Jones, supra; Caldwell v. Sioux Falls Stockyards Co., supra; notes and annotations, L. R. A. 1917F, 524 supra; annotations 15 A. L. R. 262. It is not necessary here under the averments and the proof adduced, to determine the constitutional limitations of this class of legislation.

Our Oklahoma blue sky law is similar in many of its features to the blue sky laws recently enacted in a number of other states, but in some of its provisions is essentially different. The general purpose of all such laws is to stop the sale of stock in fly-by-night concerns, visionary oil wells, distant gold mines, and other ill-considered or fraudulent enterprises. Our law contains several exceptions, to the effect that the provisions of the act shall not apply to the sale of stocks or bonds (or securities?) where the same are sold for cash and no commission or fee is paid, directly or indirectly, for the sale of the same, and no expense for such sale is charged either to the company or the purchaser of such securities.

These sales were made for cash or its equivalent, without any charge for commission or fee, bringing this transaction, as we think, within the exception just stated.

Further, this particular assignment here at issue, if it is a "security" within the meaning of the statute, was an individual purchase of an interest in an undeveloped oil property, with full knowledge on the part of both contracting parties that its ultimate value depended on future development. The record shows that the purchaser of this interest took it with full knowledge of its character and was not induced to make the purchase by means of stock sales inducements or trade talk.

The sixth clause of section 1 of the act includes the sale of securities issued in furtherance of the promotion of any enterprise or scheme for the sale of unimproved or unde-

veloped land on deferred payments or the installment plan, where such lands are without the state, and the value of the securities sold depends on future development. This provision, we assume, was intended to cover the sale of shares in distant orange groves, English walnut or pecan orchards, or other co-operative land schemes and like enterprises, where subscriptions to shares are advertised and solicited. Upon authority of the cases cited there may be some doubt as to whether it is within the power of the state to so limit the rights of individuals to contract in cases where neither party had been misled, and the purchaser acts, not by reason of stock sales inducements, but on his own untrammeled volition. We do not think the act was leveled at, or intended to apply to, a transaction of the character shown by the record. If one had knowledge that a friend owned a "wild-cat" oil lease and desired to purchase an interest therein, might he not do so without the consent of any board or agent of the state?

The information here shows that this was an assignment of an undivided interest in a block of oil and gas leases in Crawford county, Ark.; that this particular assignment was not made through the solicitation of the original promoters or any of them, but that the purchaser himself sought to become a member of the organization by purchasing an interest in these leases; that there was no definite organized plan to sell stock or shares in this property, and that the purchaser, Armstrong, by this assignment himself became in effect an original promoter and part owner of these leases, such sale, in our judgment, not coming within the purview of the penalties provided in this act.

The judgment of the trial court is reversed.

DOYLE, P. J., and MATSON, J., concur.