The promotion by the defendant company of the rabbit raising industry is just another "racket" of the day. So far $60,000 have been taken from the gullible, the company is in the hands of a receiver, there are little or no assets, and the liabilities are heavy. Even the name of the company is a fraud; it has no packing house and no packing facilities. Its only possessions are six hundred rabbits and a farm upon which there are mortgages large enough to extend into the adjoining fields. The "plant" is at Somerville. Ordinarily, a fraud so gross as this one would be enjoined almost as a *Page 62 
matter of routine, but, as unconvinced victims protest against our intervention and, as we are informed, other unscrupulous operators promoting the same scheme are invading our state to trick the unwary, we feel it our duty to expose the cheat, to caution the unsuspecting and to warn the swindlers. The promotion of the fox farm was the pastime of this gentry, now it is rabbits.
Rabbit breeding, no doubt, has its fascination, and it may be a profitable enterprise if there be a market for the meat and fur, but in this instance the only market for breeders who dealt with the defendant company was the defendant company and it had no market in which to vend in order to maintain its contracts with them.
The scheme of the defendant company was two-fold: It offered an absentee ownership agreement, called a lease, whereby, for $175, four female rabbits were sold to the absentee, who in turn leased them to the company for ten years, the company to breed them, to divide the offspring and to buy the absentee's share at $1 apiece when the offspring are eight weeks old. In its literature, which of course is colorful, the company represented that female rabbits deliver four times a year, and, of its litter, seven are permitted to be raised, a grand total of one hundred and twelve rabbits a year, fifty-six to be the property of the company and fifty-six to be purchased by the company at one dollar each. The enticing pamphlet reads:
"Your protection against loss. The Liberty Packing Corporation guarantees you against loss of your animals under an ironclad contract for ten years. If one of your animals should die, or prove unproductive, the corporation will replace her. The Liberty Packing Corporation guarantees to pay you One Dollar for each offspring when 8 weeks old. On this production basis $56 is your net profit — 32 per cent. on investment. The Liberty Packing Corporation of Somerville, N.J., has made this possible through a plan which enables you to share in the profits of the rabbit meat industry. If you live in the city and have no yard, the problem of entering the business seems a difficult one. But the Liberty Packing Corporation has removed this difficulty by a sound, safe, guaranteed plan which brings you a cash income within a few weeks from the start. Your cash multiplies as fast as your rabbits in this business. Liberty guarantees you a definite, profitable price for rabbits. And the more you raise *Page 63 
the better they will like it. If you are unable to care for your own rabbits but wish to share in the profits of this great food business, ask about the Absentee Ownership Plan."
The company was supposed to make the price and more out of the sale of the meat and pelts of the rabbits to be slaughtered and marketed. It never slaughtered or marketed rabbits and it is proved beyond peradventure that the proceeds of the sale of rabbits, per rabbit, would fall far short of the dollar apiece.
The guarantee of thirty-two per cent. income per annum alone marks the fraud. It reads like Ponzi's lure. If rabbit raising by the company warranted the guarantee, why, at all, let the victim in on the profit? Why share it?
The other equally alluring contract, known as the "buy back" contract, is to sell a unit of four does and a buck for $150, or a unit of ten does and a buck for $300, to be raised by the purchaser in his back lot. The principal bait is that the company will purchase the offspring at $1 apiece. The beguiling representation is a pamphlet called "Program Chart of Profits for one year," in which it is represented "that with an investment of $300 a net cash yearly return of $553.15 might be had." By a series of figures it demonstrates that at the end of three months the original ten does will have seventy young. The breeder retains thirty does and three bucks for breeding, thus increasing his herd to forty does and four bucks; the remaining thirty-seven young are sold to the Liberty Packing Corporation at $1 each, or $37. At the end of six months the original forty does have seventy more young. Of these, thirty-three are kept for breeding, increasing the original herd to seventy does and seven bucks; the remaining thirty-seven are sold to the Liberty Packing Corporation for $37. At the end of nine months, the forty does have two hundred and eighty young. Of these, thirty-three are retained for breeding, increasing the original herd to one hundred does and ten bucks; the remaining two hundred and forty-seven rabbits are sold to the Liberty Packing Corporation at $1 apiece, or $247. At the end of twelve months, seventy of the does will have *Page 64 
reached breeding age and delivered four hundred and ninety young which, sold to the Liberty Packing Corporation at $1 apiece, would result in a return of $490, making a total return of $811 in cash, and the herd by additions will have grown to one hundred and ten animals valued at $3,000. No consideration whatever was given to mortality and none to cost, except feeding. "Extras" charged by the company, too numerous to be recited, establish that the so-called profits are eaten up in expenses. The computation is:
 a. Total cash income for the first year .............. $811.00
 b. Cost of feeding adult and young animals ........... 257.85
 _______
 c. Net cash return on original $300 investment ....... $553.15

These opportunities were assured the purchaser for ten years, and the company paraded them as a "sure thing." On an investment of $300 his income for the ten years would be $5,531.50, and if he purchased more than one unit it would multiply proportionately so that if he bought ten units for $3,000, at the end of ten years his net income would be $55,315. But why stop at ten units?
The catch in the contract is to be found in fine print on the back that:
"9. The Liberty Packing Corporation agrees to buy from the purchaser all of the offspring from the animals purchased therefrom and all offspring from their descendants as aforesaid that have attained a weight of not less than four and one-half pounds at an age of ten weeks, at a price of $1 per offspring."
It will be noted that the rabbit must weigh four and a half pounds at the age of ten weeks.
And there is this escape from responsibility:
"4. The purchaser agrees that should the condition of his stock through lack of care, incorrect feeding, or other causes, be such that the animals fail to pass inspection to the satisfaction of the Liberty Packing Corporation's representative or representatives, for two successive inspections not less than one week apart, the Liberty Packing Corporation shall be relieved of all covenants, liabilities, conditions and promises under this contract, on written notice to the purchaser *Page 65 
herein of the cancellation of this agreement under this provision. This notice shall be deemed sufficient if sent by the Liberty Packing Corporation to the purchaser at the address given on the reverse side of this document, if registered mail, return receipt requested."
The company is the sole judge, and arbitrarily may condemn the herd and put an end to its obligation.
The scheme is pure swindle, in which the money of new purchasers is used to placate earlier victims, only to collapse when there are no more to plunder.
The home treatment lease and the "buy back" contract are securities within the meaning of our Securities act. They are written assurances for the return or payment of money.35 Cyc. 1283. See State v. Gopher Tire and Rubber Co., 146 Minn. 52;177 N.W. Rep. 937. They purport to secure to the holders of the first, a return of $56 a year upon a $175 investment, and to the second, a return of $1 apiece for rabbits upon an investment of $300. They are fraudulent generally and also come specifically within the definition of fraud of the Security act as a "promise or representation as to the future which is beyond reasonable expectation or/and is unwarranted by existing circumstances." In other jurisdictions these rabbit enterprises and the like have been condemned as fraudulent securities under their Blue Sky laws. Gracchi v. Friedlander, 93 Cal. A. 770;270 Pac. Rep. 235; State v. Robbins (Minn.), 240 N.W. Rep. 456.
Some of the breeders, purchasers in the fraudulent scheme, make objection to the action of the attorney-general in bringing these proceedings. They represent to the court, in effect, that they do not seek the protection of the state and ask that the company be left free unto them to do as they please. They want to carry on. For their consideration and enlightenment we quote the informative language of the court in Hornaday v. State
(Okla), 208 Pac. Rep. 228: "The purpose of this statute, as gathered from the title considered together with the context of the act, appears to be two-fold: First, to prevent stockbrokers and promoters from perpetrating frauds and impositions on unsuspecting investors in hazardous undertakings; second, to protect credulous and *Page 66 
incompetent persons from their own inclinations to speculate in hazardous enterprises, entered into on their own account or on the advice of friends, though not brought about by interested promoters or stockbrokers. The objects, then, are to prevent fraud and unfair dealing in securities, as well as to prevent honest people, free from sinister influences, from investing in uncertain, ephemeral, `get-rich-quick' stocks and securities. In other words, it is a statute designed, in part, to protect credulous persons against their own inherent weakness — a weakness akin to the gambler's hope of winning a prize. We think it is well settled that both of these objects, within constitutional bounds, properly come within regulations prescribed by the police power of the state. Clearly, the state has the right to protect its citizens against impositions and frauds. Just how far the state may go in acting as a guardian for is incompetent and improvident citizens is not so definitely established."
 An injunction will issue. *Page 67