687 F.2d 577
 Fed. Sec. L. Rep. P 98,715
SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,
v.
AQUA-SONIC PRODUCTS CORP., Ultrasonic Dental Products, Inc.,
Leon Schekter, Joshua M. Aber, Martin Hecht,
Dentasonic, N. V., Inventel Corp.,
Melvin Hersch, Defendants,
Martin E. Hecht and Inventel Corp., Defendants-Appellants.
 No. 1116, Docket 81-6231.
 United States Court of Appeals,
Second Circuit.
 Argued May 4, 1982.
Decided June 10, 1982.
Certiorari Denied Dec. 13, 1982.
See 103 S.Ct. 568.
 
 Richard A. Kirby, Sr. Sp. Counsel, S. E. C., Washington, D. C. (Edward F. Greene, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Anne H. Sullivan, Atty., Paul Gonson, Sol., S. E. C., Washington, D. C., of counsel), for plaintiff-appellee.
 Richard M. Asche, New York City (Litman, Friedman, Kaufman & Asche, New York City, Jack T. Litman and Russell M. Gioiella, New York City, of counsel), for defendants-appellants.
 Before FRIENDLY, KAUFMAN and PIERCE, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 Defendants Martin Hecht and Inventel Corporation appeal from a judgment of the United States District Court for the Southern District of New York, Sweet, J., 524 F.Supp. 866 (1981), declaring that they had violated §§ 5(a), 5(c), and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), 77e(c) and 77q(a); § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); and Rule 10b-5 under the latter act, and enjoining them against future violations. Defendants concede that if the licenses they were promoting were "investment contracts", and therefore "securities" within the meaning of § 2(1) of the 1933 Act and § 3(a)(10) of the 1934 Act, the securities laws were violated in that no registration was effected and the promotional materials omitted material information and contained material misrepresentations. We affirm the district court's holding that the licensing scheme was an investment contract and therefore a security within the 1933 and 1934 Acts.
 
 I. Background
 
 2
 This case concerns a plan to manufacture and distribute new dental devices termed Steri Products. Inventor Arthur Kuris conceived of an improvement of the Cavitron-a device that employs ultrasonic waves to dislodge plaque in the course of dental prophylaxis-which would use sterile water in place of tap water in order to reduce the risk of contamination. Kuris had discussions with one of his friends, M. Joshua Aber, a lawyer, and two of Aber's partners, Leon Schekter and defendant Hecht. The latter three formed a professional corporation called Schekter, Aber and Hecht, P. C. (SAH), and together the group established four corporations: Aqua-Sonic and Ultrasonic, New York corporations; Dentasonic, a Netherlands Antilles corporation; and Inventel, a Delaware corporation. Aqua-Sonic and Ultrasonic were each wholly owned by their respective principal officers; Dentasonic was owned by the three attorneys until November, 1978, when Kuris acquired a 19% interest; Inventel was owned by the three attorneys until February, 1979, at which time it redeemed Schekter's and Aber's shares, leaving Hecht as the sole owner.
 
 
 3
 Upon incorporation, Dentasonic purchased from Kuris the patent and related rights to Steri Products for the United States and Canada for $406,500, payable in installments. Dentasonic in turn sold the United States manufacturing and marketing rights to Aqua-Sonic for $26 million, to be paid from a percentage of the proceeds from the sale by Aqua-Sonic of distribution licenses and from a percentage of the proceeds from the sale of Steri Products by Aqua-Sonic licensees. Until payment of the $26 million, Dentasonic retained numerous rights vis a vis Aqua-Sonic, including certain voting rights to all of Aqua-Sonic's stock.
 
 
 4
 The proposed method of operation was that Aqua-Sonic would sell licensees the right to sell Steri Products in certain geographical regions. Ultrasonic was described to potential licensees as an optional sales agent. Inventel entered into agreements with Aqua-Sonic wherein Inventel was to be paid $2.2 million, purportedly a finder's fee, for bringing about the arrangement between Dentasonic and Aqua-Sonic and for consulting services; Inventel was also to receive a portion of the proceeds from the sale of the licenses and from the sale of Steri products and related patents or trademarks.
 
 
 5
 The promotional materials used in discussion with potential licensees or their representatives varied over the course of the offering. From May through August of 1978, the package included:
 
 
 6
 (a) an Information Memorandum describing the Steri Products and the nature of the offering, with exhibits attached thereto including a tax opinion letter prepared by SAH and financial illustrations projecting sales of the products and revenues.
 
 
 7
 (b) the Aqua-Sonic license and security agreement and notes payable to Aqua-Sonic (prior to inclusion of the so-called Advertising Fund to be discussed below), and related instructions.
 
 
 8
 (c) a document entitled "An Offer to Act as Sales Agent."
 
 
 9
 (d) the Ultrasonic sales agency agreement, security agreements, and notes payable to Ultrasonic (prior to inclusion of the Advertising Fund), and related instructions.
 
 
 10
 (e) a reprint of (an) article ... from the Journal of Periodontology (concerning the contamination of ultrasonic dental units).
 
 
 11
 (f) a four-page document entitled "Confidential for Professional Use Only."
 
 
 12
 524 F.Supp. at 869. Over the next two months, the offering package was quite similar. The Information Memorandum noted in item (a) was updated. Added to the package were "two large professional photographs of what appeared to be (completed Steri Products units,) ... a copy of a letter ... concerning the commercial production of the Steri Products", and a copy of a letter from a dental authority that was used as an endorsement for Steri Products. Id. at 870. After November 1, 1978, the following documents were added:
 
 
 13
 (a) a letter dated November 1, 1978 signed by defendant Hersch with attachments relating to the creation of the Steri Products, Advertising Fund and supplemental tax opinion by SAH.
 
 
 14
 (b) a package of revised closing documents relating to the license, sales agency and Advertising Fund, and(c) a revised summary of the offering entitled "Confidential for Professional Use Only-Summary of Revised License for Steri Products."
 
 
 15
 Id. The Information Memorandum specified the numerous obligations of the licensees, which are set out in the margin.[1] The license was indicated to be available "only to a person who has considerable knowledge and experience in financial and business matters, (and) appreciates and understands the merits and economic risks of this business."
 
 
 16
 If a licensee accepted the "Offer to Act as Sales Agent", Ultrasonic would be responsible for all sales of Steri Products for the benefit of that licensee. Under the Ultrasonic sales agency agreement, the licensee retained the right to cancel at any time upon ninety days written notice, ultimate control over pricing and other conditions relating to orders, and the right to inspect the relevant records of Ultrasonic. However, Ultrasonic was authorized to perform all significant marketing functions, such as finding customers, taking orders, collecting proceeds, and paying expenses and taxes. Additionally, Ultrasonic was authorized to reduce the sales price unilaterally so long as its commission on the sale was reduced in the same amount. Prospective licensees were informed that "by entering into the proposed Sales Agency Agreement ... you will derive substantial tax advantages in connection with your acquisition of a license."
 
 
 17
 Franchises for over one hundred territories were available. The fee for a typical territory was $159,500: $9,150 to be paid in cash upon the granting of the license; $9,150 in the form of a 7% negotiable promissory note due January 15, 1979; and $141,200 by a 6% non-recourse promissory note due January 1, 1985, but requiring pre-payment based upon a portion of the proceeds from the sale of Steri Products. A typical licensee entering into the sales agency agreement paid a $16,600 fee to defendant Ultrasonic: $500 in cash upon acceptance of the offer; $500 by a recourse promissory note payable on January 15, 1979; and $15,600 by a non-recourse promissory note due December 1, 1984, requiring prepayment based upon a portion of the sales proceeds.[2] In addition, defendant Ultrasonic was entitled to a commission of 20% of the gross proceeds from sales of Steri Products.
 
 
 18
 After the offering had been available for some time, SAH created the Advertising Fund to promote the product. This purportedly increased the tax benefits available to investors. Investors in the licenses were required to contribute $400 in cash, $400 due on January 15, 1979, and $13,200 by a non-recourse promissory note due December 1, 1984, requiring pre-payment based upon a portion of the proceeds from the sales of Steri Products. The requirement of this mandatory payment did not increase the price of the overall package to a licensee choosing to accept the Ultrasonic sales agency offer because the amount payable to Ultrasonic under that agreement was correspondingly reduced. Payments made by investors prior to creation of the Advertising Fund were transferred from Ultrasonic to the Fund.[3] After November 1, 1978, the Aqua-Sonic, Ultrasonic and Advertising Fund Agreements and accompanying materials were physically bound together and offered to licensees in a single package.
 
 
 19
 The tax opinion letter and supplementary statements indicated that all the payments covering the license fee, including the non-recourse notes, could be included in the licensee's basis for amortization over the eight year initial period of the license. In addition, licensees were advised that they could deduct the full price of the sales agency agreement and Advertising Fund during 1978 and 1979. Thus, a typical investor was personally liable for approximately $20,000 but could deduct $38,000 in 1978 and $20,000 in 1979, assuming that there were not yet any sales of the product. Investors were informed that the tax benefits were greater if they retained the sales agency. In addition, two letters were sent by Aqua-Sonic advising licensees how to treat their investment on their federal tax returns.
 
 
 20
 The Aqua-Sonic licenses were marketed throughout the United States. Hecht contacted attorneys, accountants and financial planners and recruited people to sell Aqua-Sonic licenses on commission. Some of these individuals were financial consultants for some of the investors who ultimately purchased the licenses. Between May 1 and December 31, 1978, Aqua-Sonic investments were sold to 50 licensees for approximately $12,100,000, of which $900,000 was in cash and recourse notes.
 
 
 21
 All 50 licensees entered into Ultrasonic sales agency agreement. None of these licensees had any experience selling dental products. In most cases, the territories of the licenses were not close to the licensee's residence. The promotional materials did not offer or advise of the existence of any sales agent other than Ultrasonic.
 
 
 22
 The possible applicability of the federal securities laws was brought to defendants' attention from the beginning. In the course of preparing the promotional materials, SAH sought an independent legal opinion with respect to the applicability of the securities laws to the proposed licensing scheme. SAH was advised that the arrangement might be considered an investment contract. SAH then directed one of its associates to research the issue and, after discussion, concluded otherwise. David Glasser, Aqua-Sonic's first president and sole shareholder, resigned in or about August 1978 after having been advised by his attorney that the offering might be a security under the federal securities laws and might violate other laws including antitrust and federal food and drug statutes. Leonard Suroff, who was recruited to be Ultrasonic's first president and sole shareholder and who never issued a check on behalf of Ultrasonic that was not co-signed by either Hecht or one of Hecht's partners, resigned in December 1978 because of the SEC's investigation.
 
 
 23
 The venture ultimately collapsed when mechanical difficulties prevented the timely manufacture of Steri Products. The SEC then brought this action against Aqua-Sonic, Ultrasonic, Dentasonic, Hersch, Hecht, Aber, Schekter and Inventel, seeking an injunction against future violations of the registration and antifraud provisions of the securities laws. All the defendants except Hecht and Inventel consented to such injunctions. Judge Sweet directed, 524 F.Supp. at 867, 879-80, a similar injunction against Hecht and Inventel which we now affirm.
 
 II. Discussion
 
 24
 As described above, and set out in greater detail in the district court's opinion, see 524 F.Supp. at 875, Hecht was deeply involved in virtually every aspect of the enterprise. Hecht and Inventel concede that if the licenses just described were investment contracts, the securities laws were violated in a number of ways. There was no registration of the securities. Material information was omitted from the promotional documents, including the interests of various defendants, the role of SAH, financial information relating to the use of the proceeds, and the reduced price at which licenses were offered to insiders. In addition, the market report upon which the tax opinion was based was produced in 24 hours using unverified information and was superficial with respect to key factors relevant to the tax opinion. The highly optimistic financial projections were lacking in objective support, and the product was not ready to be marketed as indicated. There had been no clinical testing, and the research materials gathered were insufficient to support the claim of the assertedly "definite causal relationship" between the use of tap water and various infections.
 
 
 25
 We thus must determine whether the enterprise described above constitutes the offering of an investment contract under the rule established in the leading case of SEC v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). As was there said, 328 U.S. at 298, 66 S.Ct. at 1102, "(t)he term 'investment contract' is undefined by the Securities Act or by relevant legislative reports." However,
 
 
 26
 the term was common in many state "blue sky" laws in existence prior to the adoption of the federal statute and, although the term was also undefined by the state laws, it had been broadly construed by state courts so as to afford the investing public a full measure of protection. Form was disregarded for substance and emphasis was placed upon economic reality. An investment contract thus came to mean a contract or scheme for "the placing of capital or laying out of money in a way intended to secure income or profit from its employment." State v. Gopher Tire & Rubber Co., 146 Minn. 52, 56, 177 N.W. 937, 938. This definition was uniformly applied by state courts to a variety of situations where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or of some one other than themselves.
 
 
 27
 By including an investment contract within the scope of § 2(1) of the Securities Act, Congress was using a term the meaning of which had been crystallized by this prior judicial interpretation. It is therefore reasonable to attach that meaning to the term as used by Congress, especially since such a definition is consistent with the statutory aims. In other words, an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party ....
 
 
 28
 328 U.S. at 298-99, 66 S.Ct. at 1102-03 (footnote 4 omitted).
 
 
 29
 It is not contested that the scheme here at issue involves "an investment of money in a common enterprise" with the expectation of profit. Rather, defendants claim that the licensees undertook important obligations, that the sales agency agreement was optional, and that even under that agreement the licensees retained significant rights, such that it cannot be said that they expected profits to be derived solely from the efforts of others.
 
 
 30
 The Commission argues that the Court's use of the term "solely" in Howey is not to be taken literally. The Ninth Circuit ruled some years ago that the "the word 'solely' should not be read as a strict or literal limitation on the definition of an investment contract (since) ... (i)t would be easy to evade (, for example,) by adding a requirement that the buyer contribute a modicum of effort." SEC v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476, 482, cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). This was shortly followed by the Fifth Circuit in SEC v. Koscot Interplanetary, Inc., 497 F.2d 473, 479-84 (1974), where Judge Gewin made a comprehensive survey of the cases in the courts of appeals and the district courts, pointed out that in the Gopher Tire & Rubber case cited by Justice Murphy in Howey the investors were required to make some efforts, and referred to one of the state cases cited in fn. 4 to the Howey opinion, Stevens v. Liberty Packing Corp., 111 N.J.Eq. 61, 161 A. 193 (1932), as having envisioned even more substantial investor participation. The Fifth Circuit has recently said:
 
 
 31
 the Supreme Court has altogether omitted the word "solely" in its most recent formulation of the investment contract definition. In United Housing Foundation, Inc. v. Forman, (421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621) supra ..., the Court quoted the investment contract definition from Howey and restated it as "an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." 421 U.S. at 852 (95 S.Ct. at 2060) ....
 
 
 32
 Williamson v. Tucker, 645 F.2d 404, 418-19, cert. denied, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). If this was intended to mean that the Supreme Court had already performed the necessary surgery on the Howey opinion, it would read too much into Forman since the Court there explicitly reserved the question whether "solely" should be taken literally, 421 U.S. at 852 n.16, 95 S.Ct. at 2060 n.16 (quoting SEC v. Glenn W. Turner Enterprises, Inc., supra, 474 F.2d 476). However, given the Court's repeated directions to consider investment schemes in light of their economic realities and the ease of circumvention if the "solely" language in Howey were to be taken literally, as well as the history summarized in Koscot, supra, we think that if faced with the question the Court would not insist on applying that language literally but would consider whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way.
 
 
 33
 As a first step in the analysis it is useful to consider whether the allegedly optional nature of the sales agency agreements removes them from the concept of investment contracts. It has long been understood that the mere existence of such an option is not inconsistent with the entire scheme's being an investment contract. Howey, supra, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244. Defendants assert that a major difference between their offering and that in Howey is that in the latter it was not economically feasible for an investor to refuse the option. Although the Court noted this, id. at 300, 66 S.Ct. at 1103, it must be remembered that 15% of the acreage sold in the scheme in that case was not covered by the optional service contracts, id. at 295, 66 S.Ct. at 1101. Thus it appears that the Court focused not on whether it was somehow possible for an investor to profit without accepting the option, or whether the investor had a bare theoretical right to reject the option, but rather on whether the typical investor who was being solicited would be expected under all the circumstances to accept the option, thus remaining passive and deriving profit from the efforts of others.[4]
 
 
 34
 Similarly, in the instant case, while it cannot be said with certainty that prospective licensees would be wholly unable to benefit without taking advantage of the sales agency agreement, it can hardly be said that realistically the agency agreement was a mere option. In SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 352-53, 64 S.Ct. 120, 124-25, 88 L.Ed. 88 (1943), the Supreme Court indicated that the relevant factors include not only the terms of the offer but also "the plan of distribution, and the economic inducements held out to the prospect." On both counts, the Aqua-Sonic offering appears to be an investment contract. The offering materials presented the license and agency agreements as a package, although within the package each was described separately and each required separate signatures. Moreover, the promotional materials indicated that additional tax benefits would accrue to investors taking advantage of the option. This is particularly important when the license agreement itself was promoted largely for the tax advantages it offered, suggesting that the prospective licensees who could be expected to be attracted to the offering in the first instance would be ones that would find the agency agreement desirable for the same reasons.[5] Defendants seek to respond to all this by indicating that the projected cash flow for the license without the sales agency option was substantially higher than the package of the two. This statement is quite misleading, and its obvious deficiency was not lost on the fifty licensees, all of whom opted for the package. The reason for the higher cash flows without the sales agency is that the projections for the package (i.e., with the agency agreement) deduct the price of the agency option and the commissions that would be owed to the agent, whereas the projections for the license alone assume equal sales penetration with no deductions whatever for the costs of distribution. In other words, the defendants' argument implicitly assumes that an investor could duplicate the results of the sales agent and could do this without any cost. More realistically, an investor who contemplated doing his own selling would have considered the likelihood that the sales projections could have been achieved without using the agent, and what costs would have been entailed.
 
 
 35
 Of course, it is possible that there would be a prospective licensee who would feel capable of doing as well or better than Ultrasonic and, because of being retired or otherwise, would have had minimal costs. In Howey, 15% of the acreage was sold to such purchasers. In weighing this argument it is useful to consider whether the offering was directed in large part at prospective licensees who could be expected to operate their own distribution system or whether "the plan of distribution," Joiner, quoted supra, was aimed primarily at investors who could not reasonably be believed to be desirous and capable of undertaking distribution on their own. For the former, the target of the offering would be individuals or corporations with experience in selling dental products.[6] However, none of the 50 licensees had any such experience. This was not mere coincidence. The record does not indicate that any attempts were made to locate such purchasers. Hecht's leading salesman was an insurance agent and financial and tax consultant; other salesmen included a salesman in investment opportunities and an accountant. Thus, the defendants recruited salesmen who could be expected to and did contact typical passive investors, not persons with experience in the distribution of dental supplies. While it is true that in determining whether the offering is an investment contract courts are to examine the offering from an objective perspective, and therefore the acceptance of the sales agency option by all 50 licensees is not decisive, this result is precisely what the defendants must have expected from their behavior.
 
 
 36
 Defendants' other major argument relies heavily upon the Fifth Circuit's dicta in Williamson, supra, 645 F.2d at 421:
 
 
 37
 In each case the actual control exercised by the purchaser is irrelevant. So long as the investor has the right to control the asset he has purchased, he is not dependent on the promoter or on a third party for "those essential managerial efforts which affect the failure or success of the enterprise."
 
 
 38
 See also id. at 423-25 (discussing circumstances in which sufficient dependence might nevertheless exist). We do not consider this, standing alone, to be an accurate statement of the law. While it is true that in Howey, the service contracts were generally for a 10-year duration without option of cancellation, and other rights of the investors were limited in some respects, 328 U.S. at 296, 66 S.Ct. at 1101, the Court did not directly rely upon these factors in reaching its conclusion, see id. at 299-300, 66 S.Ct. at 1103-04. Moreover, it would be incongruous to attach decisive significance to mere legal formality when the Court explicitly refused to be bound by "the legal terminology in which such contracts are clothed", id. at 300, 66 S.Ct. at 1103, and preceded its conclusion with a discussion of the purposes of the securities laws, which require disregarding form for substance and placing emphasis upon economic reality, id. at 298-99, 66 S.Ct. at 1102-03. Finally, if it would circumvent the purposes of the securities laws to exonerate defendants who had the guile to insert the requirement that the buyer contribute a modicum of effort, see p. 582, supra (quoting SEC v. Glenn W. Turner Enterprises, Inc., supra, 474 F.2d 476), it would be an even greater affront to the policies of these laws to exempt schemes that preserved the mere right to provide some effort.
 
 
 39
 This is not to suggest that if it was reasonable to expect investors to exercise their retained rights under the sales agency agreement in a nontrivial manner the scheme would still be an investment contract. However, in the case of the Aqua-Sonic offering, this simply was not the case. All of the preceding analysis indicating that licensees would have been expected to take the sales agency option equally suggests that they would not be likely to terminate the option and take over distribution for themselves shortly thereafter. Adding to the implausibility of such an expectation is the fact that licensees were obligated for the full price of the 8-year sales agency agreement upon acceptance; none of this fee was refundable upon termination. While it is not inconceivable that there might have been some licensees who would have made some efforts at some point in time, this is insufficient to defeat the conclusion that the scheme was an investment contract.[7]
 
 
 40
 We recognize that to write a rule precisely defining the line between contracts such as those here at issue and the typical franchise agreement, whether for Cadillacs, Coca-Cola or Kentucky Fried Chicken, may be impossible. Decision will necessarily turn on the totality of the circumstances, not on any single one. This is a situation where, in the words of Justice Holmes, "lines are pricked out by the gradual approach and contact of decisions on the opposing sides." Noble State Bank v. Haskell, 219 U.S. 104, 112, 31 S.Ct. 186, 188, 55 L.Ed. 112 (1911). But we have not the slightest doubt on which side of the line this case falls. Defendants sought to attract the passive investor for whose benefit the securities laws were enacted. His retention of some legal rights over distribution does not render it unnecessary for him to have the benefits of the disclosures provided in registration statements or the protection of the antifraud provisions. If, by contrast, the reasonable expectation was one of significant investor control, a reasonable purchaser could be expected to make his own investigation of the new business he planned to undertake and the protection of the 1933 and 1934 Acts would be unnecessary. We thus conclude that in light of the economic realities of this case and the precedents in the Supreme Court, in the state courts prior to adoption of the 1933 Act, and in the courts of appeals thereafter, the Aqua-Sonic scheme was an "investment contract" and therefore a "security".[8]
 
 
 41
 The judgment of the District Court is affirmed.
 
 
 
 [1]
 The License Agreement delineates the relationship between the parties and imposes specific duties and obligations on the Licensee. These duties include, but are not limited to: (a) vigorous promotion of the distribution and sale of the Products Parts and Supplies; (b) maintenance and employment of sufficient working capital and net worth to enable Licensee to fulfill all of his duties, obligations and responsibilities under the License Agreement; (c) employment of such agents, representatives and employees as Licensee in his sole discretion, may deem to be necessary to assist him in the performance of some or all of his duties and obligations as Licensee; (d) use and maintenance of an accounting and reporting system as may be required by Licensor; and (e) use of order forms designed by Licensor and (f) adherence to certain standards for advertising materials used in connection with the business
 ....
 ... Licensee will be an independent contractor and be solely responsible for all expenses and costs incurred by him in the conduct and promotion of his business. In addition, Licensee will be required to and be responsible for the vigorous and satisfactory promotion, distribution and sale of the Products, Parts and Supplies for use in his Territory so as to obtain a reasonable share of the market.... In the event that a Licensee does not satisfactorily fulfill his duties and responsibilities as set forth in the License Agreement, Licensor may elect to terminate his License.
 The Memorandum did indicate that a licensee may retain "agents, representatives, employees or other persons" to assist in distribution, and added:
 The choice as to whether to deal with Dental Depots and/or to retain agents, representatives, employees or others is solely that of the Licensees. The Licensor takes no position on this matter, for the most effective means of achieving satisfactory market penetration will vary according to the prior experience of the Licensee, the amount of time and effort the Licensee is willing to expend to exploit the License, and the nature of the Licensee's Territory.
 ....
 In the event that a Licensee, in his sole discretion, elects to retain and/or employ anyone to assist him in the performance of some or all of his duties, obligations and responsibilities under the License, Licensee must undertake to actively supervise their activities on his behalf to ensure that they perform their activities in a manner which will be consistent with Licensee's activities and responsibilities to Licensor.
 
 
 [2]
 Originally, the total fee was $30,600. The figures in text reflect the reduction to cover contributions to the Advertising Fund, to be discussed in the following paragraph
 
 
 [3]
 This method of financing the mandatory advertising arrangement could not have been accomplished, of course, were it not for the fact that all licensees up until that time had accepted the Ultrasonic sales agency option
 
 
 [4]
 That consideration of economic realities may not be dominant in cases concerning ordinary corporate stock, see Golden v. Garafalo, 678 F.2d 1139 (2 Cir. 1982), in no way suggests that economic realities are not controlling when determining whether an offering is an investment contract
 
 
 [5]
 Defendants cite Forman, supra, 421 U.S. at 854-55 & n.20, 95 S.Ct. at 2061-62 n.20, to support their argument that the tax aspects of the transaction are irrelevant as a matter of law. However, in that context the Supreme Court was considering what constitutes an expectation of profits. Defendants do not seriously contend that prospective licensees could not have been predicted to have an expectation of profits. The tax benefits of the transaction are relevant in that they were used as an economic inducement and thus, given the facts of this case, provide a basis for predicting the reasonable expectations and behavior of prospective licensees
 
 
 [6]
 This affords an important basis for distinguishing Mr. Steak, Inc. v. River City Steak, Inc., 460 F.2d 666 (10 Cir. 1972), see particularly p. 670, and other franchise cases on which defendants rely
 
 
 [7]
 Recall once again that in Howey 15% of the acreage was sold to purchasers not taking advantage of the service option
 
 
 [8]
 Since we find the stated reasons sufficient to conclude that the Aqua-Sonic offering was an investment contract, we need not consider the merits of the "risk capital" argument, see 524 F.Supp. at 878; Jennings & Marsh, Securities Regulation 235 (1977 ed.). We likewise need not consider the relevance of the fact that here the investment was in a new product which had never reached the market and the consequent strong dependence of licensees upon Aqua-Sonic for its development and manufacture, see 524 F.Supp. at 879